### In re OFFICE PRODUCTS OF AMERICA, INC., Debtor.

### Bankruptcy No. 91–51849–C.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Jan. 8, 1992.

Ronald Hornberger, Plunkett, Gibson & Allen, Inc., San Antonio, Tex., for Jesup, Josephthal & Co., Inc.

Robert L. Barrows, Lelaurin & Adams, P.C., San Antonio, Tex., for Trustee Randolph N. Osherow.

## DECISION AND ORDER ON APPLICATION OF JESUP, JOSEPHTHAL FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE AS FINANCIAL ADVISOR AND AGENT IN SALE OF ASSETS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the application of Jesup, Josephthal & Co., Inc. ("Jesup") for allowance of administrative expense, for acting as the financial adviser and agent in the sale of certain assets of the bankruptcy estate. Upon consideration thereof, the court finds and concludes that the fees should not be allowed, for the reasons set forth in this decision and order.

## BACKGROUND FACTS

Jesup, Josephthal & Co., Inc. ("Jesup"), Movant here, is a nationally respected investment banking firm. Office Products of America ("OPA") was a publicly held company which operated warehouse-style office products stores, located in the Northeastern United States. In an effort to expand their business and by letter dated August 1, 1990, OPA enlisted Jesup's assistance in finding $10,000,000 of "equity financing" and another $10,000,000 in long-term loans for OPA. In return for these services, Jesup was to receive $25,000 in advance for expenses; unconditionally guaranteed payment of its other expenses; and, if it secured "equity financing" or a loan, a $150,000 transaction fee plus 6% of any funds obtained on behalf of OPA. Jesup's present application for administrative expenses is based upon this original agreement, as extended and modified several times before OPA filed its Chapter 7 petition on May 14, 1991.

Despite its prepetition efforts, Jesup was unsuccessful in finding either investors or long-term lenders for OPA. However, in late 1990 and early 1991, Jesup was able to arrange a $5 million loan by Freemont Financial Corp. (Freemont) to OPA. This financing arrangement was intended to provide short-term, bridge financing until Jesup could find investors and long-term lenders for OPA. For its services in arranging the Freemont loan, Jesup received a 1.5% commission ($75,000), half of which was paid directly to Jesup and half of which was paid to Seiden Commercial Corp., pursuant to an agreement between Jesup and Seiden.

In the meantime, Jesup continued its efforts to find equity investors and long-term lenders. In late February 1991, OPA sent financial data directly to Staples, Inc., one of the two largest office products retailers on the East Coast. In March, 1991, OPA and Jesup decided to expand Jesup's role to include a possible sale of OPA's assets. Once again, the arrangement was that Jesup was to receive a specified percentage of any sale it arranged.[1] On May 14, 1991, OPA filed a voluntary Chapter 7 petition, and a trustee was appointed the following day.

On or about the same day that the trustee was appointed, Office Depot, Inc. offered approximately $4 million to purchase two of OPA's three Baltimore-area stores. About a day later, the trustee sought court approval to sell these assets and to assign

---

1. The actual agreement stated:
 "In the event JJCI [Jesup] arranges a leveraged buyout, or acquisition of OPOA, or any of its assets, a transaction fee of $150,000 will be charged plus 6% of any equity or equity-related, or purchase and sale proceeds or 3% of the total transaction value, whichever is greater. In addition, in such a transaction, JJCI will receive 250,000 warrants which will

 be exchanged on identical terms granted to the Class B Common Stockholders, and said warrants will cancel any warrant obligation under the August 1, 1990 engagement letter." (Jesup Exhibit 12c) (emphasis in the original). The underscoring denotes changes made in the terms of the original (August 1990) agreement, as it was subsequently modified in January 1991 and March 1991. (Jesup Exhibits 12a, b, c).

the leases to Office Depot, Inc., pursuant to its written offer. The court scheduled expedited hearings on these motions for June 5, 1991. The day before that hearing (June 4, 1991), an attorney for a second bidder—Staples, Inc.—contacted the trustee, seeking information about the bidding process for OPA's Baltimore-area stores.

Both Staples and Office Depot appeared at the June 5 hearing. The court conducted a sealed-bid judicial auction, in which Staples bid approximately $7,250,000 for all three Baltimore-area stores. Two Jesup representatives testified during the course of the June 5 hearing.[2]

Prior to the sale hearing, Jesup had asked the trustee to sign an agreement to employ Jesup, under terms essentially the same as those of the August 1990 arrangement between OPA and Jesup. Although the trustee never actually signed the proposed agreement, Jesup contends that by word and action the trustee indicated to Jesup that he intended to, and would, sign the agreement. In support of this contention, Jesup cites several pieces of correspondence between Jesup's attorneys and Randolph Osherow, the trustee. The letters—all which are dated between May 21, 1991, and May 29, 1991 (Jesup's Exhibits 7–10)—indicate prompt efforts by Jesup to have the trustee employ Jesup and make necessary application for court approval of said employment.[3]

In late July 1991, Jesup filed this Application for Administrative Expenses. Jesup seeks $486,000 in fees and $32,789.01 in expenses, for a total claim of $518,789.01. The $486,000 in fees represents a base transaction fee of $150,000 for the sale to Staples, plus 6% of Staples' net bid of approximately $5.6 million.[4] Although Jesup seeks payment *nunc pro tunc* to the date of the original Chapter 7 petition (May 14, 1991), the trustee has never formally applied for court approval to hire Jesup, nor has Jesup itself applied for such approval *nunc pro tunc*. The trustee has raised several objections to Jesup's claim. In addition, on September 24, 1991, the trustee filed a counterclaim, alleging that Jesup owes the estate $5,786.86 which should be set off against any fees which the court awards Jesup.

2. Jesup maintains that the representatives were present at the invitation of the trustee. The trustee denies actually inviting them. Apparently, they believed their presence would enhance the likelihood of their ultimately being paid.

3. To Jesup's credit, the letters suggest that, at the least, the trustee did not tell Jesup's attorneys that he would not employ Jesup. The letter addressed to Randolph Osherow and dated May 28, 1991 (Jesup's Exhibit 9) refers to "the agreement" which the trustee and OPA "discussed last week" and then says, "Unless I hear otherwise from you, I will send the original and one copy of the agreement to you this evening by Federal Express. Please sign the copy and deliver it to Ronny Hornberger, so that he may incorporate it in the motion for court approval that he is preparing." The May 24th letter to Mr. Osherow setting forth the terms of the alleged agreement (to which the May 28th letter refers) says:

> This letter is to confirm our understanding that Jesup, Josephthal & Co., Inc. ("Jesup") is retained to act as the financial advisor to the Trustee in connection with (i) the sale by the Trustee to Office Depot, Inc. ("Depot") of the Trustee's right, title and interest in and to those assets of Office Products of America, Ins., Debtor (the "Debtor"), which are located in Towson, Maryland and East Point, Maryland (the "Maryland Stores") and the assignment by the Trustee to Depot of the real property leases associated with the Maryland Stores, all in accordance with the letter agreement, dated May 16, 1991, *between the Trustee and Depot,* and (ii) such other matters, including the sale of other stores and assets of the Debtor ("Other Debtor Assets"), as the Trustee and Jesup shall mutually agree. Jesup was previously retained by the Debtor to assist and advise it in connection with asset sales and other transactions, including the sale of the Maryland Stores to Depot, which transaction was arranged by Jesup, with your [Osherow's] consent and at your [Osherow's] request, and Jesup continues to work toward the consummation of that transaction.

(Jesup's Exhibit 10). The trustee did not respond to the May 28th letter, but he adamantly denies ever having made any agreement to employ Jesup. In any event, he never filed an application, timely or otherwise, seeking court approval of Jesup's employment. The "unless I hear otherwise" method of "contract creation" employed by Jesup's counsel here, a common tactic among lawyers, is less successful as a means of assuring the retention of professionals in a bankruptcy case.

4. This figure approximates the total adjustments which must be made to the original $7.25 million bid by Staples. The actual total of adjustments needed remains in dispute.

Jesup urges a number of reasons why it is entitled to be paid. These arguments are summarized as issues, then discussed below.

(1) Is Jesup entitled to an administrative claim pursuant to 11 U.S.C. § 503(b)(2)?

(2) In the alternative, was the agreement between Jesup and OPA a prepetition executory contract which the trustee assumed, pursuant to 11 U.S.C. § 365?

(3) In the alternative, is Jesup entitled to assert an administrative claim under Section 503(b)(1)(A)?

(4) In the alternative, is Jesup entitled to compensation pursuant to Section 503(b)(6)? [5]

## DISCUSSION

1. *Is Jesup entitled to an administrative claim pursuant to 11 U.S.C. § 503(b)(2)?*

■ Section 503(b)(2) only applies to awards already made under 11 U.S.C. § 330(a), which requires court approval under 11 U.S.C. § 327(a). Jesup's employment pursuant to 11 U.S.C. § 327(a) was never approved by the court, nor does Jesup qualify for *nunc pro tunc* approval. Therefore, Jesup is not entitled to an administrative claim under § 503(b)(2).

(a) *The requirements of 11 U.S.C. § 503(b)(2).* Section 503(b)(2) permits "compensation and reimbursement awarded under section 330(a)" to be allowed as an administrative expense, after notice and a hearing. 11 U.S.C. § 503(b)(2). Necessarily, then, § 503(b)(2) is inapplicable unless the court has already awarded compensation to the professional under § 330(a). Section 330(a), in turn, permits compensation to "professional person[s]" only if they have been employed under § 327. *See* discussion *infra*.

■ (b) *The requirements of 11 U.S.C. § 330.* Section 330 provides that "[a]fter notice to *any parties in interest and to the United States trustee* and a hearing, ... the court may award ... to a professional person employed under section 327 ... reasonable compensation for actual, necessary services rendered by such ... professional person ... and ... reimbursement for actual, necessary expenses." 11 U.S.C. § 330 (emphasis added). Thus, professional persons seeking compensation under § 330 must first meet the requirements prescribed by § 327, governing the hiring of professional persons.[6] *Id.* To date, the trustee has not formally sought to employ Jesup pursuant to § 327, nor has the court approved Jesup's employment. Moreover, Jesup fails to meet the requirements for *nunc pro tunc* approval.[7]

Furthermore, Jesup's application for compensation fails to comply with the requirements of Rule 2016 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2016, which implement § 330. National Rule 2016 provides that an "entity seeking interim or final compensation for services ... from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Fed.R.Bankr.P. 2016. Similarly, Local Bankruptcy Rule 2016 lists multiple requirements for fee applications, including "(i) An itemized description of the services performed;/ (ii) The date the services were performed;/ (iii) The amount of time spent on those services;/ (iv) The identity and capacity of each person performing the services (i.e., attorney, lawclerk); and/ (v) the hourly rate(s) sought for each person(s) for whom compensation is sought." Bankr. L.R. 2016. The underlying purpose of these rules is to elicit, from the professional who is seeking compensation from the estate, sufficient information to permit the court to determine the reasonableness of

---

**5.** This last issue was not raised by Jesup but is suggested by the language of the Code itself.

**6.** The term "professional person," within the meaning of Section 330, does not include a trustee, an examiner, or the debtor's attorney, for whom the section also permits compensa-

tion. Only "professional persons" must have been hired pursuant to Section 327 before receiving compensation.

**7.** *See* discussion *infra*.

the compensation sought and the necessity of the services rendered. Unfortunately, Jesup's application for compensation is devoid of any details which would permit the court to make such determinations.[8]

At least two courts have held that, notwithstanding their usual way of billing, investment bankers must comply with the same procedure and timing requirements as all other professionals seeking compensation from a bankruptcy estate. *See In re Hillsborough Holdings Corp.*, 125 B.R. 837, 840 (Bankr.M.D.Fla.1991)[9]; *In re Mortgage & Realty Trust*, 123 B.R. 626, 633 (Bankr.C.D.Cal.1991). In addition, one New York bankruptcy court has attempted to remedy what it perceives as a "collision course between investment bankers/advisors and the Bankruptcy Code, and apparently a non-competitive market," and has established "requirements for the future retention of all investment bankers/advisors who seek to be retained" before that court:

> Any investment banker/advisor retention application submitted to this court must present the scope and complexity of the assignment, its anticipated duration,

expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them, projected salaries of participating professionals, billing rates and prevailing fees for comparable engagements, current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job. In addition, the actual retention agreement between the investment banker/advisor and the client must be attached to the retention application and, [sic] the party retaining the professional must describe the process by which the financial banker/advisor has been selected. This latter requirement is aimed specifically at offsetting what [the court] perceive[s] as a lack of competitiveness in the selection process. Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in Hillsborough, 123 B.R. at 838–39, where there are armies of professionals apparently doing

---

**8.** The final page of Jesup's application merely says that "Jesup requests payment, as an administrative expense of the Chapter 7 case, of the following amounts:

| | |
|---|---|
| Base transaction | $150,000.00 |
| 6% of gross sales price of assets sold: | |
| 6% × Successful Staples bid of $7.25 million less adjustments to a net of approximately $5.6 million) | 336,000.00 |
| Fees total | $486,000.00 |
| Expenses: | |
| Reimbursement of all expenses incurred | $57,789.01 |
| Less expense allowance | <25,000.00> |
| Net expenses | $ 32,789.01 |
| Total Requested Administrative Expense Claim | $518,789.01 |

**9.** Judge Paskay, citing to Judge Bufford's opinion in *In re Mortgage & Realty Trust*, said:

> In *Mortgage & Realty Trust*, Judge Bufford held that before investment advisers [sic] retained are entitled to compensation, the investment advisers must keep time records for each professional employed who performed services in the case, and the application must include the date and description of the services performed and the amount of time spent (in billing increments of tenths of an hour or less). This Court is unable to find any authority supporting the proposition that investment advisors are not subject to the mandate of

Bankruptcy Rule 2016(a), which requires that any entity seeking compensation shall file an application setting forth a detailed statement of services rendered, time expended, and expenses incurred. While this Rule may not please the community of investment advisors, this Court is constrained to conclude that the Bankruptcy Rules are controlling, not the general policy or custom of the investment advisors which prevails in the operation of the business of investment bankers or advisors. *Id.*

the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice.... Only with an advance picture of the job to be accomplished will [courts] be able to measure the results (or lack thereof) achieved.

*In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 27 (Bankr.S.D.N.Y.1991) (footnotes omitted).

It may well be that investment bankers could justify a different standard for summarizing their work product for court consideration, as such professionals, like appraisers and real estate brokers, do not normally bill by the hour. The excesses which many bankruptcy judges have experienced firsthand may well explain the strong reactions of the courts in New York and Tampa (and other places as well, for that matter), and may even justify the strictures which those courts have placed on the profession. Even under a more lenient approach to documentation, however, the application of Jesup falls woefully short of explaining, much less justifying, the basis for their asserted claim in this case. If the standards of *Hillsborough Holdings* and *Drexel Burnham* are applied, then Jesup's application (absent other considerations discussed in this decision) would merit no further review at all.

■ (c) *The requirements for nunc pro tunc approval, pursuant to 11 U.S.C. § 327.* The subsection of § 327 applicable to the instant facts is § 327(a), which provides that the "trustee, with the court's approval, may employ ... professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." 11 U.S.C. § 327(a). Although § 327(a) requires court approval of the employment of professional persons, the Bankruptcy Code neither expressly requires pre-employment approval nor forbids retroactive (*nunc pro tunc*) approval. *In re Twinton Properties Partnership,* 27

B.R. 817, 819 (Bankr.M.D.Tenn.), *aff'd,* 33 B.R. 111 (1983); *see also Fanelli v. Hensley, (In re Triangle Chemicals, Inc.),* 697 F.2d 1280, 1284 (5th Cir.1983). Even so, the Code and rules contemplate that court approval will ordinarily precede employment, and that *nunc pro tunc* approval will be the rare exception—reserved for extraordinary circumstances—not the rule. *In re Triangle Chemicals,* 697 F.2d at 1289; *see also In re Aladdin Petroleum Co.,* 85 B.R. 738, 739 (Bankr.W.D.Tex. 1988). Clearly, there is no *right* to *nunc pro tunc* approval. *In re Kroeger Properties & Dev., Inc.,* 57 B.R. 821, 822 (Bankr. 9th Cir.1986).

Indeed, the system envisioned by the Code and rules for employing professional persons works most efficiently and effectively when the court reviews and approves the application for employment before any services are performed. *In re Twinton Properties,* 27 B.R. at 819. The very purpose of § 327(a) (and Bankruptcy Rule 2014, which implements § 327(a)), is to "protect the estate from wasteful or fraudulent dissipation[,] which in turn serves a central purpose of the Bankruptcy Court: equitable distribution or reorganization of the estate." *Windsor Communications Group, Inc. v. Rogers & Rogers, Inc. (In re Windsor Communications Group, Inc.),* 68 B.R. 1007, 1016 (E.D.Pa.1986). Prior approval of employment helps to advance this purpose by ensuring " 'that the court may know the type of individual who is engaged in the proceeding, their [sic] integrity, their [sic] experience in connection with work of this type, as well as their [sic] competency concerning the same.' " *In re Arkansas Co.,* 798 F.2d 645, 648 (3d Cir.1986) (quoting *In re Hydrocarbon Chemicals, Inc.,* 411 F.2d 203, 205 (3d Cir.) (en banc), *cert. denied,* 396 U.S. 823, 90 S.Ct. 66, 76, 24 L.Ed.2d 74 (1969)); *Clinton Marine Products, Inc. v. Sero Holdings, Inc. (In re Saybrook Mfg. Co.),* 108 B.R. 366, 369 (Bankr.M.D.Ga.1989). Prior approval also provides the court with a means of exercising some control over administrative expenses. *Land v. First Nat'l Bank (In re Land),* 116 B.R. 798, 806 (D.Kansas

1990) (quoting from *Collier on Bankruptcy* ¶ 327.02 for the same proposition).

The case law is inconsistent about exactly what constitutes "extraordinary circumstances" sufficient to warrant *nunc pro tunc* approval. At the very least, a professional seeking *nunc pro tunc* approval of employment must comply with the requirements of § 327; that is, he or she must be a disinterested person and must not hold or represent an interest adverse to the estate. *See* 11 U.S.C. § 327(a); *see also In re Triangle Chemicals*, 697 F.2d at 1289; *In re Arkansas Co.*, 798 F.2d at 650; *In re Federated Dep't. Stores, Inc.*, 114 B.R. 501, 506 (Bankr.S.D.Ohio 1990); *In re Hospitality Ltd.*, 86 B.R. 59, 65 (Bankr.W.D.Pa.1988). In addition, some courts have held that because *nunc pro tunc* approval is discretionary and essentially remedial, the bankruptcy court should weigh the equities of the case before granting such approval. For example, a New Jersey bankruptcy court held that the court should

> weigh the good faith of the professional in proceeding without an order and take into account the response to information that the order has not been entered. [The court] must further determine the emergent need for the services rendered and whether or not the debtors could have functioned without such services. Other factors for consideration include a determination of whose responsibility it was to obtain authorization, the applicant's relationship with the debtors and his own sophistication in the field.

*In re Freehold Music Ctr., Inc.*, 49 B.R. 293, 296 (Bankr.D.N.J.1985). Other courts have said that the professional must satisfactorily explain his failure to obtain prior court approval. *See, e.g., In re Arkansas Co.*, 798 F.2d at 650; *In re Federated Dep't Stores, Inc.*, 114 B.R. at 506 (quoting *In re Coast Trading, Inc.*, 62 B.R. 664 (Bankr.D.Or.1986)). Some factors which courts have considered in this regard include: "whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties"; and whether the failure to obtain prior approval was due to excusable neglect, fault of the trustee (debtor in possession), or hardship beyond the professional's control. *E.g., In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105–06 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *In re Arkansas Co.*, 798 F.2d at 650; *Stempler v. Larimore (In re Florida Airlines, Inc.)*, 110 B.R. 570, 572 (M.D.Fla.1990); *In re J.D. Lynnan No. 2, Inc.*, 72 B.R. 411, 413–14 (W.D.Pa.1987); *In re Saybrook Mfg. Co.*, 108 B.R. at 369; *In re Hospitality Ltd.*, 86 B.R. at 65; *In re Lindo's Tours, USA, Inc.*, 55 B.R. 475, 478 (Bankr. M.D.Fla.1985).

Other courts have been quite flexible in granting *nunc pro tunc* approvals. In *In re Rich Joyce Enterprises, Inc.*, for example, the court approved employment of real estate brokers *nunc pro tunc* because the brokers were able to sell some of the debtor's real property for an extremely profitable price. 76 B.R. 42, 44 (E.D.N.Y.1987). In contrast to the case at bar, however, the debtor in possession in *Rich Joyce* actually retained the services of the real estate brokers but merely failed to seek court approval of that employment. *Id.* at 42. In awarding the real estate brokers their commissions, the court reasoned that "to deny the brokers the compensation they have earned would give the debtor's stockholders a windfall. It would be inequitable in the extreme to use a principle intended to protect creditors to create a windfall for the very persons who entered into the agreement to pay compensation and who have received the benefit of that agreement." *Id.* at 44. Similarly, in *In re Knudsen Corp.*, a California bankruptcy court was quite lenient in approving the employment of an investment banker *nunc pro tunc* merely upon a finding that the bank appeared to have been a disinterested person, that the services rendered appeared to have been necessary, and that the compensation sought was reasonable. 67 B.R.

254, 255 (Bankr.C.D.Cal.1986). The debtors in *Knudsen,* however, consented to the entry of the *nunc pro tunc* order. *Id.* *Knudsen* is thus also distinguishable from the case a bar, because here the trustee objects to Jesup's request for *nunc pro tunc* approval.

Finally, still other courts have imposed strict standards for *nunc pro tunc* approval, requiring the applicant to establish the following nine criteria by clear and convincing evidence:

1. The debtor, trustee or committee expressly contracted with the professional to perform the services which were thereafter rendered;

2. The party for whom the work was performed approves the entry of the *nunc pro tunc* order;

3. The applicant has provided notice of the application to creditors and parties in interest and has provided an opportunity for filing objections;

4. No creditor or party in interest offers reasonable objection to the entry of the *nunc pro tunc* order;

5. The professional satisfied all the criteria for employment pursuant to 11 U.S.C.A. § 327 (West 1979) and Rule 215 [now 2014(a)] of the Federal Rules of Bankruptcy Procedure at or before the time services were actually commenced and remained qualified during the period for which services were provided;

6. The work was performed properly, efficiently, and to a high standard of quality;

7. No actual or potential prejudice will inure to the estate or other parties in interest;

8. The applicant's failure to seek pre-employment approval is satisfactorily explained; and

9. The applicant exhibits no pattern of inattention or negligence in soliciting judicial approval for the employment of professionals.

*In re Willamette Timber Systems, Inc.,* 54 B.R. 485, 488–89 (Bankr.D.Or.1985) (citing *In re Twinton Properties,* 27 B.R. at 819–20). While the Fifth Circuit has never expressly accepted or rejected these nine

factors, were they applied to the instant facts, Jesup would certainly fail to comply with requirements # 2 and # 4, inasmuch as the trustee (the party for whom the work was done) has never approved the entry of the *nunc pro tunc* order. To the contrary, the trustee has raised reasonable objections to the entry of a *nunc pro tunc* order. In addition, serious doubt exists about whether the trustee ever expressly contracted with Jesup to perform the services rendered in the first place (requirement # 1).

Significantly, these last facts—the trustee's continued refusal to seek *nunc pro tunc* approval of Jesup's employment, coupled with his active opposition to Jesup's claim for compensation—distinguish the instant case from other *nunc pro tunc* cases. The failure of this trustee to seek prior approval was not merely a mistake or oversight. Here, the trustee contends that he never engaged Jesup's services in the first place. These points are relevant because § 327(a) only permits the *trustee* to employ a professional. Furthermore, Rule 2014 says that an order approving the employment of a professional pursuant to § 327 shall be made "only on application of the *trustee* or committee." Fed.R.Bankr.P. 2014. Rule 2014 is implemented in this district by Local Bankruptcy Rule 2014, which states that an "application to approve the employment of a professional person shall be made and signed by the *entity seeking to employ* that person; [sic] (e.g., Trustee, Debtor-in-Possession, Debtor, Committee, etc.)." Nowhere do the Code or the Rules authorize professionals to seek court approval—*nunc pro tunc* or otherwise—for their own employment. Even if Jesup were to meet all other requirements for *nunc pro tunc* approval, then, the mere fact that the trustee refuses to seek, and continues to oppose, such approval precludes its use.

2. *In the alternative, was the agreement between Jesup and OPA a prepetition executory contract which the trustee assumed, pursuant to 11 U.S.C. § 365?*

 (a) *Was the agreement between Jesup and OPA a prepetition executory*

*contract?* Clearly the contract in question was "pre-petition" because the parties entered into it in August 1990, and last modified it on March 4, 1991, well before the petition date of May 14, 1991; but the contract was not executory as of the petition date.

The Bankruptcy Code does not define "executory contract," but the Notes of the Committee on the Judiciary, in reference to § 365, defined an executory contract as one " 'on which performance remains due to some extent on both sides.' " *In re Easebe Enterprises, Inc.,* 900 F.2d 1417, 1419 (9th Cir.1990) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5844); *Benevides v. Alexander (In re Alexander),* 670 F.2d 885, 887 (9th Cir.1982) (also quoting from Senate Report No. 989). In his article *Executory Contracts in Bankruptcy: Part I,* Professor Countryman said that an "executory contract" is one

"under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."

*Benevides v. Alexander,* 670 F.2d at 887 (quoting from Prof. Countryman's article, published at 57 Minn.L.Rev. 439, 460 (1973)); *In re Lee Way Holding Co.,* 100 B.R. 950, 956 (Bankr.S.D.Ohio 1989) (also quoting from Prof. Countryman's article); *In re Monroe Well Serv., Inc.,* 83 B.R. 317, 319 (Bankr.E.D.Pa.1988) (also quoting from Prof. Countryman's article); *In re Ridgewood Sacramento, Inc.,* 20 B.R. 443, 444 (Bankr.E.D.Calif.1982) (also quoting from Prof. Countryman's article).

■ Applying the definition to the instant facts, it might appear, at first glance, that the exclusive engagement agreement between Jesup and Office Products, as modified, was an executory contract because "performance remained due to some extent on both sides." In its final form, however, the original contract was only extended to March 31, 1991. (Application of Jesup, Josephthal & Co., Inc. for Allowance of Administrative Expense, Ex. "B.")

Therefore, by its own terms, the contract expired prior to the petition date. Moreover, the particular section of the agreement at issue here provided:

"5) In the event JJCI arranges a leveraged buyout, or acquisition of OPOA, *or any of its assets,* a transaction fee of $150,000 will be charged plus 6% of any equity or equity-related, *or purchase and sale* proceeds or 3% of the total transaction value, whichever is greater. In addition, in such a transaction, JJCI will receive 250,000 warrants which will be exchanged on identical terms granted to the Class B Common Stockholders, and said warrants will cancel any warrant obligation under the August 1, 1990 engagement letter."

(Application of Jesup, Josephthal & Co., Inc. for Allowance of Administrative Expense, Ex. "C.") This portion of the contract was merely an offer to enter into a unilateral contract; it was not itself a binding bilateral contract. The provision did not obligate Jesup to arrange a leveraged buyout, or acquisition of OPOA, or any of its assets; nor would the failure of Jesup to complete performance of paragraph five have constituted a material breach. Rather, the provision merely offered certain consideration to Jesup *if* it did arrange such a buyout or acquisition. The crucial factor which makes a contract executory, as of the time the bankruptcy petition is filed, is the existence of unperformed *mutual* obligations. *In re California Steel Co.,* 24 B.R. 185, 187 (Bankr.N.D.Ill.1982). There being no executory contract, the trustee could not have assumed it, even had he wished to.

■ (b) *Did the trustee assume the contract?* Even were this an executory contract, it was not assumed. Under § 365, an executory contract can only be assumed by formal motion and approval of the court.

■ The trustee filed no motion and received no court approval to assume this contract with Jesup. Pursuant to the express language of § 365(a), an executory contract cannot be assumed without a formal motion and the court's approval. *Swiss Hot Dog Co. v. Vail Village Inn,*

*Inc. (In re Swiss Hot Dog Co.)*, 72 B.R. 569, 571 (D.Col.1987) (11 U.S.C. § 365 clearly mandates court approval); *Schondorf v. Calin*, 58 B.R. 1014, 1016 (D.N.J.1986) (11 U.S.C. § 365 explicitly requires court approval of the trustee's assumption of an executory contract; trustee cannot impliedly accept a contract); *In re Metro Transp. Co.*, 87 B.R. 338, 342 (Bankr. E.D.Pa.1988) (executory contract cannot be assumed merely by postpetition conduct; contract can only be assumed by formal motion and court approval); *In re A.H. Robins Co., Inc.*, 68 B.R. 705, 708–09 (Bankr.E.D.Va.1986) (executory contract may not be assumed without court approval). What is more, in a Chapter 7 case, if the trustee does not assume an executory contract "within 60 days after the order for relief" is entered, the contract is "deemed rejected." 11 U.S.C. § 365(d)(1); *see also In re Del Grosso*, 115 B.R. 136, 139 (Bankr. N.S.Ill.1990) (according to express language of Code, only court approval of timely formal motion to assume executory contract will preclude automatic rejection mandated by § 365(d)(1); court has no jurisdiction to reinstate executory contract which has been automatically rejected under § 365(d)(1)).

This rule, that the trustee cannot impliedly assume an executory contract, is all the more appropriate when, as here, the alleged executory contract was one for professional services. If the trustee were permitted to circumvent the requirements of § 327 by impliedly assuming a prepetition executory contract to hire a professional, Section 327 would be eviscerated. *See In re Providence Television Ltd. Partnership*, 113 B.R. 446, 450–51 (Bankr.N.D.Ill. 1990); *see also In re Marlin Oil Co.*, 83 B.R. 50, 51 (Bankr.D.Colo.1988). Indeed, even an *express* assumption of such a contract would override the more specific provisions of § 327, a result which this court eschews. *See* discussion *infra.*

3. *In the alternative, is Jesup entitled to assert an administrative claim under Section 503(b)(1)(A)?*

Jesup argues that the trustee "induced Jesup to perform and that the trustee ap-propriated all the benefits of that contract and performance." (Post-trial Memorandum of Josephthal & Co., Inc. (f/k/a Jesup, Josephthal & Co., Inc.) in Support of Application for Allowance of Administrative Expense, at 19.) Therefore, says Jesup, the trustee should be estopped from denying his employment of Jesup, and Jesup should be allowed an administrative claim under Section 503(b)(1)(A) for $486,000 in fees and $32,789.01 in expenses, which Jesup contends is the fair market value of the services it rendered to the estate. Jesup's pleadings and briefs fail to specify the particular theory or theories upon which it bases its position. Sometimes, Jesup appears to be relying upon equitable estoppel. At other times, it seems to be arguing promissory estoppel. Some points even sound like quantum meruit arguments. Because the Jesup position confuses elements of all three theories, the court has considered each theory in turn and finds that all three fail.

(a) *Is the trustee equitably estopped from denying his employment of Jesup?* No. Jesup neither argued nor proved the elements of equitable estoppel. To establish equitable estoppel under Texas law, Jesup had to prove the following elements: "(1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted on, (4) to a party without knowledge of those facts, (5) who detrimentally relied upon the misrepresentation." *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex.1991). Similarly, under New York law, the elements of equitable estoppel are " '(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.' " *Melron Amusement Corp. v. Town of Mamaroneck*, 104 A.D.2d 858, 480 N.Y.S.2d 373, 375 (1984).

Assuming that Jesup's arguments even raise equitable estoppel, the facts do not establish it. There is no "material fact" of which the trustee is alleged to have knowl-

edge which the trustee concealed with intention that Jesup act on that concealment. What is more, there is no proof of an intent on the part of the trustee that Jesup rely on any "concealment." The facts thus do not support an equitable estoppel.

■ Even if they did, the doctrine would not entitle Jesup to an administrative claim under § 503(b). Equitable estoppel at best precludes the person estopped—because of his act, conduct, or silence—from asserting a right which he otherwise would have had; it does not necessarily confer any affirmative rights upon Jesup. *See Theriot v. Smith*, 263 S.W.2d 181, 183 (Tex.1953). As has already been discussed, the trustee cannot employ a professional by implication, nor can he assume an executory contract by implication. Thus, the trustee is not seeking to assert a "right." He is resisting (rightfully) Jesup's attempt to use the doctrine of equitable estoppel to raise a "right" in favor of Jesup.

■ In essence, Jesup hopes to use the doctrine to craft an exception to the statutory restrictions imposed by § 503(b). This it simply may not do. Section 503(b)(1)(A) permits priority payment for "the actual, necessary expenses of preserving the estate ..." It does not apply to compensation for professionals. *F/S Airlease II Inc. v. Simon*, 844 F.2d 99, 108 (3rd Cir. 1988). Professionals are compensated under § 503(b)(2), which permits priority payment for compensation awarded under § 330(a), which in turn requires that the professional first be retained pursuant to § 327(a). *Id.* There is simply no room in this statutory scheme for the sort of exception Jesup here proposes. To paraphrase the Third Circuit, if Jesup were able to be compensated under § 503(b)(1)(A), it would render § 327(a) nugatory and would contravene Congress' intent in providing for prior approval. *Id.* at 109.

Administrative claims are paid in full, dollar for dollar, to the detriment not of the trustee but the unsecured creditors of the estate. The extent to which such claims are allowed is controlled strictly by statute, in deference to the interests of those creditors. Consistent with that purpose, costs of administration may only be authorized by the court if they are authorized by the statute. *See Matter of Ryan*, 82 B.R. 929, 933 (N.D.Ill.1987). Jesup cannot use equitable estoppel to force the trustee or the court to do what the Code, rules, and strong policy considerations forbid.

■ (b) *Does the doctrine of promissory estoppel prevent the trustee from denying his employment of Jesup?* No. Under New York law, the doctrine of promissory estoppel has three elements: ' " 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.' " ' *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989). Under Texas law, the doctrine has essentially the same elements. *See English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983) (elements of promissory estoppel are: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment").

The applicability of promissory estoppel to the instant case is suspect, though, because Jesup knew, or should have known (on advice of counsel) that the trustee could not possibly have hired it to provide professional services for the estate unless he made application to the court and received court approval. As has already been discussed, there is no provision in the Code for the trustee to hire professionals by implication. Similarly, an executory contract—if there were even one involved here—could only have been assumed by formal motion and court approval. *See* discussion *supra.* Therefore, Jesup's supposed reliance upon the trustee's alleged inducement to perform, absent the trustee's filing of an application to employ Jesup or a motion to assume an executory contract, is questionable. Jesup's supposed reliance is all the more doubtful because this is not a case where the trustee merely forgot to apply to hire Jesup. Here, the trustee adamantly opposes both the hiring and the compensation of Jesup.

■ More significantly, just as permitting the trustee to assume, by implication or otherwise, an executory contract for professional services would render Section 327 meaningless, so too would permitting professionals to seek compensation under § 503(b)(1)(A) even though they failed to qualify for compensation under § 503(b)(2), as it intersects with §§ 327, 328, and 330. As the Colorado bankruptcy court observed in *In re Marlin Oil Company:*

> Congress cannot have intended that a professional person could sidestep the specific requirements set forth [in 11 U.S.C. §§ 327, 328, 330, and 503(b)(2)] and come in later and claim payment under the general provision of § 503(b)(1)(A) as an actual, necessary cost of preserving the estate. Nor was it contemplated that professionals such as attorneys, [sic] could enter into executory contracts pre-petition and have the Debtor assume such a contract and thus avoid the scrutiny of the Court and the other creditors under the Code provisions cited, *supra.*

83 B.R. at 51; *see also In re F/S Airlease II, Inc. v. Simon,* 844 F.2d at 109; *In re Cutler Mfg. Corp.,* 95 B.R. 230, 231 (Bankr. M.D.Fla.1989) (professionals cannot come before court seeking rights under § 503 which they could not acquire under § 327).

■ Even if, as Jesup claims, the trustee reneged on a promise to hire Jesup,[10] "[d]amages recoverable in a case of promissory estoppel are not the profit that the promisee expected, but only the amount necessary to restore him to the position he would have been in had he not acted in reliance on the promise." *Fretz Constr. Co. v. Southern Nat'l Bank,* 626 S.W.2d 478, 483 (Tex.1981); *accord Arcadian Phosphates,* 884 F.2d at 73 (citing New York law); *see also Restatement (Second) of Contracts* § 349 cmt. b (reliance damages are appropriate in cases of promissory estoppel). Thus promissory estoppel warrants only reliance damages. Were promissory estoppel applicable under the instant facts, and the court has already found that it is not, the only damages which could possibly be attributable to Jesup's reliance upon the trustee's conduct are the costs incurred in sending two Jesup representatives to San Antonio to testify at the June 5, 1991, hearing on the Trustee's Motion to Sell Office Stop Stores. *See* Josephthal Exhibit 2. All the other expenses for which Jesup seeks reimbursement were incurred prepetition anyway, and § 503(b)(1)(A) specifically limits allowable administrative expenses to those incurred "after the commencement of the case." *See* Josephthal Exhibit 1; Backup to Josephthal Exhibit No. 1; *see also* 11 U.S.C. § 503(b)(1)(A).

■ (c) *Is Jesup entitled to quantum meruit compensation?* No. Quantum meruit is an equitable remedy, independent of contract, for which the claimant must prove that: " '(1) valuable services were rendered or material furnished;/ (2) for the person sought to be charged;/ (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him;/ (4) under such circumstances as *reasonably* notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.' " *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990) (quoting *City of Ingleside v. Stewart,* 554 S.W.2d 939, 943 (Tex.Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)); *see also Martin H. Bauman Assocs., Inc. v. H. & M. Int'l Transport, Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404, 407–08 (1991). Jesup maintains that it is entitled to quantum meruit damages[11] because of

---

**10.** This is a question of fact upon which the court finds that Jesup did not meet its burden of proof.

**11.** Actually, Jesup never used the term "quantum meruit" in any pleadings or briefs. Jesup merely maintains that it is entitled to the "fair market value" of its services, and that this marketplace valuation establishes the reasonable value of their services. *See, e.g.,* Post-trial Memorandum of Josephthal & Co., Inc. (f/k/a Jesup, Josephthal & Co., Inc.) In Support of Application for Allowance of Administrative Expense, at 27–28. The appropriate measure of damages in quantum meruit, however, is essentially the same—the "reasonable value of the services rendered." *Vortt Exploration,* 787 S.W.2d at 945.

the tremendous benefit Jesup's efforts conferred upon the estate. The trustee, by contrast, argues that Jesup played no "meaningful role," in the Staples sale because Jesup never presented its brochure to Staples, never made any investment-banker introductions to the trustee, and even advised the trustee to disregard competing bids by Staples. *See* Supplemental Brief of Trustee on Fee Application of Jesup, Josephthal & Co., Inc., at 4–5. Jesup has failed to convince the court that the sale of the Office Stop stores and the consequent benefits conferred upon the estate resulted solely, or even primarily, from Jesup's efforts. Therefore, Jesup did not meet its burden of proof on the first element necessary for quantum meruit—showing that valuable services were rendered.

■ However, even if Jesup's efforts did benefit the estate, Jesup would not be entitled to quantum meruit damages simply on that basis. *See In re Southern Diversified Properties, Inc.,* 110 B.R. 992, 996 (Bankr.N.D.Ga.1990) (rejecting doctrine of quantum meruit as justifiable basis for compensating professional who did not qualify under § 327(a)). The court is aware that at least one bankruptcy court has suggested that a party not otherwise entitled to attorneys fees under Sections 330 and 503(b) might be able to seek compensation in quantum meruit. *See In re Club Assocs.,* 107 B.R. 794, 797 (Bankr. N.D.Ga.1989). The judge in *In re Club Associates,* however, merely mentioned quantum meruit in dicta and solicited a brief setting forth any legal authority supporting an award of attorneys' fees and expenses in quantum meruit. Such supporting authority, if any exists, would necessarily clash with the Code and rules, which set forth the precise means by which professionals are to be employed and compensated.

Granting Jesup compensation in quantum meruit would open the door for professionals to flock to asset cases, eager to confer some sort of benefit, then to demand compensation as an administrative expense in quantum meruit, without ever bothering to seek approval for its employment or to file an appropriate fee application. Trustees would have to regard with suspicion any friendly assistance that might come his or her way, fearful of being presented with a bill later. *See In re Providence Television,* 113 B.R. at 451. As the *Providence Television* court noted:

> The fact that such services may have been beneficial or valuable to the estate and performed in good faith is immaterial, as is any hardship to the unauthorized professional. *Matter of Futuronics Corp.,* 655 F.2d 463, 469 (2d Cir.1981). This rule must necessarily be firm in order to "maintain control of costs." *In re Garland,* 8 B.R. 826, 828 (Mass.1981). Otherwise the "necessary power of the court to ensure that assets of the estate are not wasted", [sic] would be undermined. *In re Fiberglass Specialty Co., Inc.,* 12 B.R. 119, 121 (Minn.1981).

*Id.* (quoting *In re Met–L–Wood Corp.,* 103 B.R. 972, 975 (Bankr.N.D.Ill.1989)). Jesup's quantum meruit theory of recovery is not only inadequate to support its claim, but would make for bad bankruptcy policy to boot and so must be rejected.

**4.** *In the alternative, is Jesup entitled to compensation pursuant to Section 503(b)(6)?*

■ One argument not urged by Jesup is suggested by the provisions of § 503 itself. Section 503(b)(6) allows "fees and mileage payable under chapter 119 or title 28" (28 U.S.C. § 1821 *et seq.*) to be paid as an administrative claim. 11 U.S.C. § 503(b)(6). Specifically, 28 U.S.C. § 1821(a)(1) states that a "witness in attendance at any court of the United States ... shall be paid the fees and allowances provided by this section." Although Jesup did not seek compensation under § 503(b)(6), it is possible that the two representatives who testified at the June 5 hearing could be compensated for "the actual expenses of travel," including "the most economical rate reasonably available" on a common carrier; "taxicab fares between places of lodging and carrier terminals"; and a "subsistence allowance ... not to exceed the maximum per diem allowance

prescribed by the Administrator of General Services, pursuant to section 5702(a) of title 5, for official travel in the area of attendance by employees of the Federal Government." 28 U.S.C. § 1821(c)(1),(3); (d)(1), (2). In addition, under § 1821(b), they would be entitled to "an attendance fee of $40 per day for each day's attendance," as well as the attendance fee "for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance."

Jesup has not sought (much less documented) any entitlement to an administrative claim under this provision. The way is still open for them to do so, if they so desire.

### CONCLUSION

Except for a possible claim under § 503(b)(6), which Jesup has not sought, Jesup is not entitled to any sort compensation from the estate as an administrative expense. Its application must therefore be DENIED, without prejudice to its filing an appropriate application for compensation pursuant to § 503(b)(6).

So ORDERED.